UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2012-78 (WOB-JGW)

AMY KENT                                                    PLAINTIFF

VS.                  <u>MEMORANDUM OPINION AND ORDER</u>

MINNESOTA LIFE
INS. CO.                                                    DEFENDANT

   This is a dispute over the proceeds of a life insurance policy which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.  As such, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

   This matter is before the Court on the motion for summary judgment by third-party plaintiff Julia Finnigan (Doc. 37) and the motion for summary judgment by plaintiff Amy Kent (Doc. 43).  The Court previously heard oral argument on these motions and took them under submission.  Upon further review, the Court now issues the following Memorandum Opinion and Order.

***Factual and Procedural Background***

**A.   The Disputed Minnesota Life Policy**

Minnesota Life Insurance Company ("MN Life")[1] issued a life insurance policy to the late Robert Finnigan ("Robert") in connection with his employment by Wells Fargo.  Coverage under this policy began January 1, 2010, and the policy carried a death benefit of five times Robert's highest base salary, or $1,225,000.00.  At issuance, the policy named Robert's wife, Julia, as the sole beneficiary.

However, Robert and Julia, who had been married for 24 years, divorced later in 2010.  A Final Judgment of Dissolution of Marriage was entered by a Florida Circuit Court on November 17, 2010, incorporating a Marital Settlement Agreement ("MSA") between the parties.  (Doc. 43-2).  Under the MSA, Robert was obligated to pay Julia $6,0000.00 per month alimony.  (MSA ¶ 10).  This provision further states: "The alimony shall terminate absolutely upon the death of either party or Julia's remarriage." (*Id.*).

---

[1] As noted below, Minnesota Life is no longer a party to this case, having been dismissed by agreement of the parties.

The MSA also contains a clause entitled "Life Insurance," which states:

> Bob's obligations to pay alimony to Julia [] will be secured by life insurance on Bob's life payable to Julia on Bob's death in the amount of $1,000,000.00. Bob agrees to maintain this insurance at his sole cost until the obligations cease . . .

*Id.* ¶ 12.

Julia testified that Robert, prior to his death, paid her all the alimony payments she was owed under the MSA. (Julia Depo. 28).

Finally, the MSA also states that the spouses would retain all assets in his or her name, unless specifically stated otherwise. (MSA ¶ 9A).

In February 2011, Robert changed the beneficiary designation under this policy, removing Julia and naming his girlfriend, Amy Kent, and his longtime secretary, Rachelle Petruziello, as equal beneficiaries. (Doc. 39, ML AR 136).

### B. The Lincoln Policies

During his life, Robert had two other life insurance policies, both through Lincoln Benefit Life. The first policy ("Lincoln Policy No. 1") carried a death benefit of $1 million and originally named Julia as the beneficiary. However, on May 15, 2010, Robert removed Julia and replaced

her with the Finnigans' son, Michael.  (Doc. 51-2 at 1-2).  Robert later allowed the policy to lapse.

Robert also took out a second policy in 1996 through Lincoln with a $1 million death benefit, also originally naming Julia as the beneficiary.  In May 2010, however, he removed Julia as the beneficiary and replaced her with his sister, Tara Finnigan, and his son, Michael, as co-beneficiaries.

### C. Robert's Death and Ensuing Litigation

Robert died on August 5, 2011.  MN Life shortly thereafter received a beneficiary designation form listing Kent and Petruziello as co-beneficiaries under the policy.  On or about August 21, 2011, Petruziello submitted a claim form seeking payment of fifty-percent of the benefits under the policy.  On or about August 31, 2011, MN Life paid Petruzzielo half of the policy's benefits.  (Doc. 51-2 at 18).  Around the same time, MN Life received, for the first time, notice of Julia's competing claim to the policy's benefits.

During this same time period, Julia, Michael, and Tara made claims under the second Lincoln policy.  Faced with competing claims, Lincoln filed a statutory interpleader action in the United States District Court for the Southern District of Florida seeking a declaration as to who was

4

entitled to the insurance proceeds under that policy. *Lincoln Benefit Life Co. v. Julia Finnigan, Tara Finnigan, and Michael Finnigan*, S.D. Fla. Case No. 11-81262-CIV-Middlebooks/Brannon. Julia filed an answer in that case asserting that she was entitled to the proceeds under the second Lincoln policy pursuant to her divorce agreement with Robert. (Julia Finnigan Depo. 50-52; Doc. 51-2 at 4).

By Omnibus Order dated July 6, 2012, the Florida District Court held under Florida law[2] that the MSA was not specific in designating the Lincoln policy and that Julia was thus not entitled to the proceeds thereunder:

> Tara contends that the Policy is not specifically mentioned in the Agreement. After considering the plain language of the Agreement, I concur. In order to comply with the Provision, Bob was not required to use this specific Policy as security; indeed, Bob could have purchased a new life insurance policy or used an existing policy to satisfy his obligation. Assuming the Parties intended the policy mentioned in the Provision to be one of Bob's existing life insurance policies, at the time the Parties executed the Agreement, Bob had only one life insurance policy, policy number 0100653339 also issued by Lincoln, on his life payable to Julia for $1,000,000, which is a different policy from the Policy at issue here. The record does not include any facts that the Parties intended this Policy to satisfy Bob's obligation to maintain a life insurance policy to secure his obligations under the Agreement.

---

[2] Because the policy was not issued in connection with Robert's employment, its interpretation was not governed by ERISA.

(Doc. 43-3 at 3-4). The Court thus held that Tara and Michael Finnigan were entitled to the proceeds of the policy. (*Id.*).

> The Court also noted:
>
> While the Provision obligates Bob to purchase an insurance policy on his life payable to Julia for $1,000,000, this Provision was carefully drafted to require Bob to only maintain this policy to secure his other obligations under the Agreement. This Provision was not included in the Agreement as part of the settlement of marital property rights between Julia and Bob, in fact, Bob's obligation under the Provision ceased once his obligations to pay alimony and Michael's medical expenses terminated.
>
> . . .
>
> Since the Policy was owned solely in Bob's name and was not mentioned in the Agreement or transferred to Julia as part of the settlement of the marital property, the Agreement provides that Bob retained exclusive ownership over the Policy.

(*Id.* at 5-6).

In addition, Julia has filed a professional negligence action against her divorce attorney in Florida[3], alleging that he failed to ensure that a life insurance policy was maintained for her benefit to be payable at Robert's death. (Doc. 43-2).

Julia's complaint in that action alleges that the life insurance clause of the MSA "did not specify any particular policy [or] the carrier of the policy." (Doc. 43-2 at 3).

---

[3] The parties do not state when this action was filed.

It further alleges that, after Robert's death, "Julia discovered, for the first time, that the only life insurance policy owned by Robert at the time of this death that identified Julia as a beneficiary lapsed prior to his death." (*Id.*).

Finally, the Complaint alleges that Julia was harmed by her divorce attorney's professional negligence in that "no life insurance is available to provide for her support after the death of Robert." (*Id.*).

In the meantime, Kent had filed this action on February 21, 2012, in Mason Circuit Court against MN Life seeking the remaining fifty-percent of the life insurance benefits. (Doc. 1, Exh. A). MN Life removed the action to this Court on March 14, 2012. (Doc. 1).

On April 19, 2012, MN Life filed an answer and counterclaim in interpleader seeking permission to deposit with the Clerk $647,616.66, representing "the portion of the life insurance benefit at issue in this case, along with applicable interest." (Doc. 7 at 9). Additionally, on April 19, 2012, MN Life filed a Third-Party Complaint in Interpleader against Julia. (Doc. 8). On May 8, 2012, the Court granted MN Life's motion to deposit the remaining fifty-percent of the life insurance benefits into the Court. (Doc. 13-2 at 2).

7

Thereafter, Julia filed an amended Fourth-Party Complaint against Petruziello. (Doc. 23).

Petruziello then filed a motion to dismiss for lack of personal jurisdiction. (Doc. 30). The Court held a hearing on April 5, 2013. The Court concluded that this was not a proper interpleader action because plaintiff Kent asserted claims relief for which, if successful, would exceed the fund that MN Life had paid into Court. (Doc. 34). The Court also dismissed Petruzzielo for lack of personal jurisdiction. (*Id.*).

Thereafter, however, the parties reached an agreement that plaintiffs would not seek in excess of the deposited funds, MN Life's interpleader claim was reinstated, and the Court dismissed MN Life, leaving only Kent and Finnigan as parties. (Doc. 40).

Kent and Finnigan have now filed cross motions for summary judgment which are ripe for review.

### *Analysis*

It is not disputed that the MN Life insurance policy was issued to Robert Finnigan through his employment as part of an "employee welfare benefit plan" and, as such, it is subject to ERISA.

ERISA contains a broad preemption clause, the effect of which is generally to trump state law with respect to

8

the designation of beneficiaries under ERISA-controlled insurance policies. *See Metropolitan Life Ins. Co. v. Marsh*, 119 F.3d 415, 420 (6th Cir. 1997). However, ERISA exempts from such preemption any divorce decree that constitutes a "qualified domestic relations order" ("QDRO"). *Id.* at 421.

"The initial question of whether a domestic relations order is a . . . QDRO is one for the federal courts." *Metropolitan Life Ins. Co. v. Darkow*, No. 5:09CV02482, 2010 WL 3002032, at *3 (N.D. Ohio July 30, 2010) (citation omitted).

It is not disputed that the MSA between Robert and Julia Finnigan was a "domestic relations order" insofar as it was made pursuant to state domestic relations law and it relates to the provision of alimony and marital property rights. *See* 29 U.S.C. §1056(d)(3). What is disputed is whether the MSA was a *qualified* domestic relations order.

If the MSA qualifies as a QDRO, it is not preempted by ERISA and should be given effect. If the MSA is not a QDRO, ERISA preempts the MSA and requires that the plan beneficiary form -- which designates Kent and Petruziello as fifty-percent each beneficiaries -- be enforced.

A domestic relations order is "qualified" under ERISA only if it "clearly specifies" the following:

9

>  (i) the name and last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
>
>  (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage if determined,
>
>  (iii) the number of payments or period to which such order applies, and
>
>  **(iv) each plan to which such order applies.**

29 U.S.C. §1056(d)(3)(C) (bold added).

In *Marsh*, the Sixth Circuit held that a divorce decree that was "specific enough to substantially comply with ERISA's requirements" and is not "ambiguous" or lacking in "essential information" will satisfy the QDRO requirements. *Marsh*, 119 F.3d at 422.

It is the fourth of these requirements -- specification of the plan to which the domestic relations order applies -- that is disputed in this case.

A review of *Marsh* and other Sixth Circuit case law demonstrates that the MSA in this matter does not sufficiently identify the plan to which it applies to meet the fourth requirement.

In *Marsh*, the relevant divorce decree stated that the couple's minor children would be named as beneficiaries of "the proceeds of Plaintiff's insurance through Metropolitan Life Insurance Company, maintained at his place of

employment." *Id.* at 417. After the husband's death, the insurance company brought an interpleader action to determine whether the children or the deceased's second wife -- whom he had designated on his plan beneficiary form -- were entitled to the policy proceeds. In considering whether the divorce decree sufficiently identified the plan to which it applied, the Sixth Circuit stated:

> While the divorce decree did not specify where deceased was employed, *the decree identified the policy as one through Metropolitan Life Insurance Company maintained at his place of employment.* This permitted identification of the plan [] is not ambiguous.

*Id.* at 422 (emphasis added).

In similar cases, the Sixth Circuit and District Courts within this Circuit have held that a divorce decree adequately identifies an insurance policy for QDRO purposes where it states that the policy is one maintained by the obligor in connection with his or her employment. *See Mattingly v. Hoge*, 260 F. App'x 776, 779 (6th Cir. 2008) (holding that divorce decree was QDRO where it "stated clearly that the plan at issue was Joseph Mattingly's General Electric life insurance policy"); *Seaman v. Johnson*, 91 F. App'x 465, 470-71 (6th Cir. 2004) (holding that divorce decree identified plan with enough specificity where it referenced group policies that husband "may have

11

in connection with his employment"); *Metropolitan Life Ins. Co. v. Darkow*, No. 5:09CV02482, 2010 WL 3002032, at *6 (N.D. Ohio July 30, 2010) (QDRO requirement of plan identification held satisfied where divorce decree referenced spouses' "respective life insurance policy plans as available through employment"); *Metropolitan Life Ins. Co. v. Cronenwett*, 162 F. Supp.2d 889, 896 (S.D. Ohio 2001) (divorce decree adequately identified applicable plan to qualify as QDRO where it stated that husband would maintain "a certain basic life insurance policy that he has at General Motors Corporation").

In contrast, the MSA between the Finnigans lacks any descriptive information that would permit identification of the plan to which it purports to apply. The pertinent clause simply states that Robert's alimony obligation will be secured "by life insurance on Bob's life payable to Julie on Bob's death in the amount of $1,000,000.00." It does not state whether the insurance is a policy maintained through Robert's employment, as in the above cases, or even whether the referenced policy is one then in effect or one to be purchased pursuant to the divorce agreement. Nor is the name of any issuing insurance company identified, as in some of the above cases.

12

A similar non-specific, broad insurance provision was held insufficient to render a divorce decree a QDRO in *O'Neil v. O'Neil*, 136 F. Supp.2d 690 (E.D. Mich. 2001). The divorce decree there referenced "any life insurance policies, endowment, or annuity contracts standing in the name of or insuring the life of Plaintiff." *Id.* at 694. The plaintiff argued that this provision was sufficient because it was simple to determine from surrounding circumstances the plan to which the decree referred. The Court rejected this argument, stating:

> Perhaps it could be deduced from the insurance provision that Patrick intended to have his estate serve as the alternate payee of his Met Life insurance proceeds. Nonetheless, in order to qualify as a QDRO, the Judgment must have at least substantially complied with § 1156(d)(3). It does not. Rather, it is the very type of broad provision that [the Sixth Circuit has] found to be insufficient to avoid ERISA preemption.

*Id.* at 694-95.

Indeed, the Finnigans' MSA lacks the necessary specificity under the Sixth Circuit's seemingly most liberal reading of the QDRO plan identification requirement. *See Metropolitan Life Ins. Co. v. Clark*, 159 F. App'x 662, 665 (6th Cir. 2005) (holding that a divorce decree constituted a QDRO where it identified "any policy of insurance *presently in force* upon [the husband's] life") (emphasis added).

13

In contrast, as noted, the Finnigans' MSA does not even state whether the policy contemplated was one then in effect or one to be purchased by Robert to fulfill his divorce obligations. Julia's argument that the MN Life policy was the only one then in force that named her as a beneficiary, and that it could be identified by process of deduction, is thus unavailing. *See O'Neil*, 136 F. Supp.2d at 694-95.

Other evidence supports this conclusion. First, Julia testified in her deposition that she was not even aware of the existence of the MN Life policy until after Robert's death, and they never discussed any particular policy in the course of their divorce negotiations. (Julia Depo. 34, 36).

Second, Julia alleged in the interpleader action filed by Lincoln in Florida that the Lincoln policy in dispute there was the one contemplated by the MSA. (Julia Finnigan Depo. 50-52; Doc. 51-2 at 4 ¶ 18).

Third, in express recognition of the inadequacy of the insurance clause of the MSA, Julia has sued her divorce attorney for professional negligence, averring that the MSA "did not specify *any particular policy* [or] the carrier of the policy" and that "no life insurance is available to

provide for her support after the death of Robert." (Doc. 43-2 at 3 ¶ 10) (emphasis added).

Finally, the Court notes that the MSA expressly provides that the purpose of the insurance policy was to secure Robert's monthly alimony obligation to Julia. (Doc. 43-2 at 18 ¶ 12). However, the MSA also states that Robert's obligation to make those alimony payments would expire at his death. (*Id.* at 17 ¶ 10). Because Robert paid all alimony due to Julia prior to his death (Julia Depo. 28), there was no amount left owing for the policy to secure.[4]

Under the above authority, therefore, the MSA does not qualify as a QDRO under ERISA; the MSA is preempted; and Robert Finnigan's designation of Kent as a co-beneficiary of the MN Life policy controls. Kent is thus entitled to summary judgment and to payment of the funds that MN Life previously deposited into this Court.

---

[4] While Julia testified that it was her intent that she receive insurance proceeds upon Robert's death, independent of the alimony, the MSA does not so provide. That issue will no doubt be central to Julia's professional negligence claim against her divorce attorney. However, the Court notes that Julia could not recover under the MSA as written because, even if it qualified as a QDRO, Robert left no obligation to be secured by the policy.

15

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1) The motion for summary judgment by plaintiff Amy Kent (Doc. 43) be, and is hereby, **GRANTED**;

(2) The motion for summary judgment by third-party plaintiff Julia Finnigan (Doc. 37) be, and is hereby, **DENIED**; and

(3) **Within ten (10) days of entry of this Memorandum Opinion and Order**, plaintiff's counsel shall tender a Proposed Order for distribution of the funds previously deposited into the Court's Registry, in the amount of $650,611.09 plus interest accrued, indicating how the check(s) should be made payable and the address to which the check(s) should be mailed.

This 29th day of October, 2013.



Signed By:
William O. Bertelsman WOB
United States District Judge

16